IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

J.N.J.C,
by next friend Laurie Tye,

    Plaintiff,

v.                                                                 Case No.: 2:16-cv-00301-DEJ

DANIEL COOPER, et al.,

    Defendants.

**DEFENDANTS' PROPOSED FINDINGS OF FACT IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

City of Kenosha, Daniel Cooper, Aaron Dillhoff, Andrew Valeri, Alex Wicketts and Aaron Stich, by their attorneys, ARENZ, MOLTER, MACY, RIFFLE & LARSON, S.C., respectfully submit the following Proposed Findings of Fact in Support of their Motion for Summary Judgment:

1. On August 24, 2015, the City of Kenosha Police Department (KPD) was called to investigate a fight at Columbus Park in Kenosha, Wisconsin. (**Reginato Aff., Ex. 1, 9/29/16 Transcript of Andrew Valeri Deposition (Valeri Depo), p. 4:10-14.**)

2. Officer Andrew Valeri and Sergeant Daniel Cooper responded to Columbus Park in separate squad cars. (**Reginato Aff., Ex. 2, 9/27/16 Transcript of Daniel Cooper Deposition (Cooper Depo), p. 4:17-24**); (**Reginato Aff., Ex. 1, Valeri Depo., p. 5:7-18.**)

3. As Officer Valeri and Sergeant Cooper pulled up to the park, they spotted four individuals who appeared to be arguing: two males and two females (Plaintiff, Daniel Tate, S.W.

and J.B). (**Reginato Aff., Ex. 1, Valeri Depo., p. 6:13-21**); (**Reginato Aff., Ex. 2, Cooper Depo, p. 5:4-7, 22-24.**)

4. Plaintiff was almost 6'5" tall and weighed nearly 400 pounds on the date of the incident. (**Reginato Aff., Ex. 2, Cooper Depo., pp. 5:22-25; 6:1, 6-9**); (**Reginato Aff., Ex. 3, 1/17/17 Transcript of Plaintiff's Deposition (P's Depo.), pp. 10:12-22; 11:1-4.**)

5. Based on the conduct they observed, it appeared to Officer Valeri and Sergeant Cooper that Plaintiff and Tate were engaging in a physical altercation. (**Reginato Aff., Ex. 2, Cooper Depo., pp. 5:6-7; 6:3-5.**) "They were pushing each other…. The smaller of the two males (Tate) was charging at the larger male (Plaintiff)." (**Reginato Aff., Ex. 2, Cooper Depo., p. 6:7-10.**)

6. As Officer Valeri and Sergeant Cooper parked, it appeared that "the smaller of the two males [Tate, was] trying to attack one of the females [S.W.] about five feet away." (**Reginato Aff., Ex. 2, Cooper Depo., p. 7:1-4.**)

7. As Officer Valeri and Sergeant Cooper parked, the officers noticed that Tate was "pointing his finger [and] yelling at" S.W. (**Reginato Aff., Ex. 3, P's Depo., p. 57:9-19.**) S.W. was crying and also shouting at Tate. (**Reginato Aff., Ex. 3, P's Depo., p. 57:15-18.**)

8. Officer Valeri and Sergeant Cooper noticed that Plaintiff was physically restraining Tate (holding him back) and believed that Tate was attempting to charge at and/or attack S.W. (**Reginato Aff., Ex. 1, Valeri Depo., p. 7:10-17**); (R**eginato Aff., Ex. 2, Cooper Depo., p. 8:10-13**); (**Reginato Aff., Ex. 3, P's Depo., p. 57:19-24.**)

9. Plaintiff admits "there was lots of commotion" at that time and the scene "was pretty disorderly." (**Reginato Aff., Ex. 3, P's Depo., pp. 53:23-25; 54:1-3.**)

10. Officer Valeri and Sergeant Cooper then parked and exited their vehicles. (**Reginato Aff., Ex. 1, Valeri Depo., p. 11:1-2.**)

11. At that point, Sergeant Cooper heard Tate yelling and shouting profanity at S.W. (**Reginato Aff., Ex. 2, Cooper Depo., pp. 8:25; 9:1-4.**)[1]

12. Tate was also flailing his arms, pointing at S.W., and being held-back by Plaintiff. (**Reginato Aff., Ex. 2, Cooper Depo., p. 9:2-4**); (**Reginato Aff., Ex. 1, Valeri Depo., p. 12:6-9**); (**Reginato Aff., Ex. 3, P's Depo., p. 59:2-8, 22-24.**)

13. Sergeant Cooper decided to place Tate under arrest for disorderly conduct. (**Reginato Aff., Ex. 2, Cooper Depo., p. 9:3-4.**)

14. After exiting their vehicles, Officer Valeri and Sergeant Cooper started walking towards Tate. (**Reginato Aff., Ex. 2, Cooper Depo., p. 9:6-8**); (**Reginato Aff., Ex. 1, Valeri Depo., p. 13:1-16.**)

15. Sergeant Cooper ordered Tate to "come by me." (**Reginato Aff., Ex. 2, Cooper Depo., p. 9:6-9**) (**Reginato Aff., Ex. 4, 9/13/16 Transcript of J.B. Deposition (J.B. Depo), pp. 39:10-21; 40:1-7.**)[2]

16. Sergeant Cooper ordered Tate to "stop." (**Reginato Aff., Ex. 3, P's Depo., p. 62:10-11.**)

17. Tate refused Sergeant Cooper's orders and started walking backwards away from the officers. (**Reginato Aff., Ex. 3, P's Depo., pp. 63:1-4; 65:13-17.**)

---

[1] Plaintiff testified that he has no recollection (either way) and therefore cannot dispute this fact. (**Reginato Aff., Ex. 3, P's Depo., p. 59:14-16.**)
[2] Plaintiff testified that he has no recollection (either way) and therefore cannot dispute this fact. (**Reginato Aff., Ex. 3, P's Depo., p. 62:5-9.**)

18. Tate continued walking away from the officers for approximately seven seconds until Sergeant Cooper attempted to grab him. (**Complaint, Ex. A, Video Footage, 17:36:39-17:36:46**); (**Reginato Aff., Ex. 3, P's Depo., p. 65:13-17.**)

19. During those seven seconds, Sergeant Cooper followed Tate and ordered him to "come by me" and to "place [your] hands behind [your] back." (**Reginato Aff., Ex. 2, Cooper Depo., p. 9:17-19**); (**Reginato Aff., Ex. 4, J.B. Depo., p. 40:12-16**); (**Reginato Aff., Ex. 3, P's Depo., p. 66:4-6.**)

20. Tate did not come by Sergeant Cooper, did not stop, and did not place his hands behind his back at that time. (**Reginato Aff., Ex. 4, J.B. Depo., p. 41:19-24**); (**Reginato Aff., Ex. 2, Cooper Depo., pp. 9-10**); (**Reginato Aff., Ex. 3, P's Depo., p. 67:12-18.**)

21. Instead, Tate continued walking away from the officers with his fists tightly clenched and his arms bent "like he was preparing to punch" Officer Cooper. (**Reginato Aff., Ex. 2, Cooper Depo., pp. 9:23-25; 10:1-4**); (**Reginato Aff., Ex. 3, P's Depo., p. 67:12-18.**)

22. Tate was also shouting "LEAVE ME ALONE" and "STAY THE FUCK AWAY FROM ME" at the officers. (**Reginato Aff., Ex. 2, Cooper Depo., p. 10:18-23**); (**Reginato Aff., Ex. 4, J.B. Depo., p. 40:18-24**); (**Reginato Aff., Ex. 3, P's Depo., pp. 63:9-13; 64;1-5.**)

23. Sergeant Cooper attempted to grab Tate; however, Tate "moved [his] arm away from the officer" and shouted "DON'T PUT YOUR FUCKING HANDS ON ME" and "DON'T FUCKING TOUCH ME." (**Reginato Aff., Ex. 5, 1/17/17 Transcript of Daniel Tate Deposition (Tate Depo.), p. 48:10-14**); (**Reginato Aff., Ex. 3, P's Depo., pp. 66:22-25; 67:9-11.**)

24. Because Tate was refusing orders, was acting disorderly and screaming profanity, was continuing to walk away from the officers, and appeared to be preparing to strike Sergeant

4

Cooper, Sergeant Cooper decided to escort Tate to the ground using a takedown maneuver. (**Reginato Aff., Ex. 2, Cooper Depo., p. 10:18-23.**)

25. Tate landed on his stomach with his left arm tucked underneath his body and his right arm "halfway up." (**Reginato Aff., Ex. 5, Tate Depo., p. 49:17-21.**)

26. Sergeant Cooper landed "on top of [Tate] but more to the side," informed Tate he was under arrest, and ordered him to place his hands behind his back multiple times. (**Reginato Aff., Ex. 5, Tate Depo., pp. 49:14-16; 50:2-8**); (**Reginato Aff., Ex. 2, Cooper Depo., p. 11:8-13.**)[3]

27. Tate refused to place his hands behind his back and tensed his arms. (**Reginato Aff., Ex. 2, Cooper Depo., p. 11:8-12**); (**Reginato Aff., Ex. 5, Tate Depo., pp. 50:9-18; 52:11-12.**)

28. Because Tate was actively resisting, Officer Valeri went to the ground to assist Sergeant Cooper and attempted to force Tate's arms behind his back. (**Reginato Aff., Ex. 1, Valeri Depo., p. 15:12-18.**)

29. Tate continued resisting by keeping one of his arms "tensed up underneath his body." (**Reginato Aff., Ex. 1, Valeri Depo., p. 15:12-18.**)

30. The officers were therefore required to use knee/empty-hand strikes to gain compliance. (**Reginato Aff., Ex. 2, Cooper Depo., pp. 13:15-19; 14:1-5.**)

31. While Officer Valeri and Sergeant Cooper were on the ground struggling to arrest Tate, Plaintiff stood two or three feet behind Sergeant Cooper and, with a raised voice, repeated (more than ten times) "LEAVE HIM (TATE) ALONE" and "HE (TATE) DIDN'T DO ANYTHING." (**Reginato Aff., Ex. 3, P's Depo. pp. 70:9-17; 72:2-23.**)

---

[3] Plaintiff testified that he has no recollection (either way) and therefore cannot dispute this fact. (**Reginato Aff., Ex. 3, P's Depo., p. 69:12-19.**)

5

32. Officer Valeri noticed Plaintiff standing right behind the officers and became concerned for the following reason: "It was turning into a very unsafe situation when we're already at a position of disadvantage, being on our knees, with someone walking up behind one of our officers." (**Reginato Aff., Ex. 1, Valeri Depo., p. 18:13-17.**)

33. Officer Valeri then radioed additional officers for backup. (**Reginato Aff., Ex. 1, Valeri Depo., p. 18:13-17.**)

34. Sergeant Cooper felt threatened by Plaintiff's close proximity and ordered Plaintiff to move back. (**Reginato Aff., Ex. 2, Cooper Depo., p. 14:8-12**); (**Reginato Aff., Ex. 3, P's Depo. p. 73:12-21.**)

35. Plaintiff refused to move back and replied: "It's a public park" and "I don't have to go anywhere." (**Reginato Aff., Ex. 3, P's Depo., p. 74:4-8, 14-17.**) S.W. "turn[ed] around … [and] start[ed] walking back." (**Reginato Aff., Ex. 3, P's Depo., p. 76:4-14.**)

36. Sergeant Cooper then disengaged from Tate, stood up and directed his attention to Plaintiff. (**Reginato Aff., Ex. 2, Cooper Depo., p. 14:14-20**); (**Reginato Aff., Ex. 3, P's Depo., p. 76:15-18.**)

37. While standing, Sergeant Cooper ordered Plaintiff to "get back" once again. (**Reginato Aff., Ex. 3, P's Depo. p. 77:1-17.**)

38. At that point, Officer Alex Wicketts arrived at the scene (in response to Officer Valeri's call), approached Plaintiff and also ordered him to back up. (**Reginato Aff., Ex. 6, 9/27/16 Transcript of Alex Wicketts Deposition (Wicketts Depo.), pp. 10:22-25; 11:1-5**); (**Reginato Aff., Ex. 3, P's Depo., p. 78:23-25.**)

39. Plaintiff refused Officer Wicketts' order and shouted it's "A PUBLIC PARK, AND I [DON'T] HAVE TO LEAVE AND [] DANNY DIDN'T DO ANYTHING." (**Reginato Aff., Ex. 3, P's Depo., p. 78:16-25.**)

40. Sergeant Cooper then returned his attention to Tate on the ground while Officer Wicketts continued speaking with Plaintiff. (**Reginato Aff., Ex. 2, Cooper Depo., p. 15:7-10**); (**Reginato Aff., Ex. 3, P's Depo. p. 80:11-18.**)

41. During this time, Officer Wicketts ordered Plaintiff to back up numerous times; however, Plaintiff refused and shouted "THIS IS A PUBLIC PARK" and "I DON'T FUCKING HAVE TO DO ANYTHING." (**Reginato Aff., Ex. 3, P's Depo. pp. 78:21-22; 79:1-10.**)

42. Officer Wicketts then asked Plaintiff to stop using profanity and once again ordered him to back up. (**Reginato Aff., Ex. 6, Wicketts Depo., pp. 13:22-25; 14:1-2.**)[4]

43. When Plaintiff refused, Officer Wicketts informed Plaintiff that he was under arrest and ordered him to place his arms behind his back. (**Reginato Aff., Ex. 6, Wicketts Depo., p. 14:4-10.**)[5]

44. Officer Wicketts then placed Plaintiff's right arm behind his back. (**Reginato Aff., Ex. 6, Wicketts Depo., p. 14:14-16**); (**Reginato Aff., Ex. 3, P's Depo. pp. 81:5-6, 20-25.**)

45. When Officer Wicketts started to place Plaintiff's left arm behind his back, Plaintiff "pull[ed] his left arm away from behind [his] back" and "freed [his] left arm from Officer Wicketts' grip." (**Reginato Aff., Ex. 3, P's Depo. pp. 82:1-20.**)

46. Plaintiff then raised his left arm in front of him and away from Officer Wicketts. (**Reginato Aff., Ex. 3, P's Depo., p. 82:21-23.**)

---

[4] Plaintiff testified that he has no recollection (either way) and therefore cannot dispute this fact. (**Reginato Aff., Ex. 3, P's Depo., p. 80:19-24.**)
[5] Plaintiff testified that he has no recollection (either way) and therefore cannot dispute this fact. (**Reginato Aff., Ex. 3, P's Depo., p. 81:13-16.**)

47. Plaintiff also bladed his body away from Officer Wicketts. (**Reginato Aff., Ex. 6, Wicketts Depo., p. 14:14-25.**)[6]

48. Wicketts interpreted Plaintiff's conduct as active resistance, began struggling with Plaintiff, and continued ordering Plaintiff "several times to put his hands behind his back." (**Reginato Aff., Ex. 6, Wicketts Depo., pp. 14:25; 15:1-3, 16-20.**)[7]

49. Plaintiff kept his left arm out in front of him and did not place it behind his back. Wicketts then applied a takedown maneuver escorting Plaintiff to the ground and delivered a knee-strike. (**Reginato Aff., Ex. 6, Wicketts Depo., p. 15:16-20**); (**Reginato Aff., Ex. 3, P's Depo., p. 83:22-25.**)

50. Plaintiff landed on his stomach with his right arm tucked underneath his body and his left arm at his side. (**Reginato Aff., Ex. 3, P's Depo. p. 85:12-20**.)

51. Officer Wicketts landed to perpendicular to Plaintiff and was not directly on top of Plaintiff. (**Reginato Aff., Ex. 3, P's Depo. pp. 86:1-5.**)

52. At around this time, Sergeant Cooper disengaged from Tate to assist Officer Wicketts secure Plaintiff. (**Reginato Aff., Ex. 3, P's Depo. pp. 86:24-25; 87:1-3.**)

53. At around this time, Officer Aaron Stich also arrived at the scene to provide assistance. (**Reginato Aff., Ex. 3, P's Depo. p. 86:6-17.**)

54. Immediately after landing on the ground, Officer Wicketts repeatedly ordered Plaintiff to place his arms behind his back while Officer Stich forced Plaintiff's left arm behind his back. (**Reginato Aff., Ex. 6, Wicketts Depo., p. 17:12-15**); (**Reginato Aff., Ex. 3, P's

---

[6] Plaintiff testified that he has no recollection (either way) and therefore cannot dispute this fact. (**Reginato Aff., Ex. 3, P's Depo. pp. 82:21-25; 83:1-5.**)
[7] Plaintiff testified that he has no recollection (either way) and therefore cannot dispute this fact. (**Reginato Aff., Ex. 3, P's Depo. p. 83:10-13.**)

8

**Depo. pp. 87:14-21; 88:2-7**); (**Reginato Aff., Ex. 7, 9/27/17 Transcript of Deposition of Aaron Stich (Stich Depo.), p. 10:15-21.**)

55. In doing so, Officer Stich "could feel [Plaintiff's] arms tensing up" and testified "[t]here was a lot of resistance with that arm, and I was having a hard time getting it behind [Plaintiff's] back." (**Reginato Aff., Ex. 7, Stich Depo., pp. 10:19-21; 18:7-11**); (**Reginato Aff., Ex. 3, P's Depo., p. 90:2-7.**)

56. After Officer Stich forced Plaintiff's left arm behind his back, he continued to feel resistive tension and believed Plaintiff was attempting to pull the left arm away. (**Reginato Aff., Ex. 7, Stich Depo., p. 10:19-21**); (**Reginato Aff., Ex. 3, P's Depo., p. 90:2-7.**)

57. Plaintiff did not place his right arm behind his back but kept it tense and underneath his body. (**Reginato Aff., Ex. 3, P's Depo. pp. 89:22-25; 90:1.**)

58. Officer Wicketts attempted to pry Plaintiff's right arm out from underneath his body but "there was too much resistive tension for [him] to pull it out." (**Reginato Aff., Ex. 6, Wicketts Depo., pp. 17:19-25; 18:1.**)

59. Officer Wicketts "could feel that [Plaintiff] was tense [and] that he was flexing." (**Reginato Aff., Ex. 6, Wicketts Depo., p. 17:20-23.**)

60. At that point, Plaintiff turned his body towards J.B. (who had walked away from the immediate area) and shouted "CALL MOM, CALL MOM." (**Reginato Aff., Ex. 3, P's Depo. p. 93:2-8.**)

61. Plaintiff claims that he felt a knee/leg pressing down on his back while he was on the ground; however, he has no knowledge of who, or of which officer, did the same. (**Reginato Aff., Ex. 3, P's Depo., pp. 97-98.**)

9

62. At that point, Officer Wicketts attempted to gain compliance by delivering two empty-hand strikes to Plaintiff's upper-shoulder area while also repeating orders "to give me your hands [and] put your hands behind your back." (**Reginato Aff., Ex. 6, Wicketts Depo., p. 18:3-8**); (**Reginato Aff., Ex. 3, P's Depo., pp. 94:3-10.**)[8]

63. At this time, the officers were still attempting to physically pry Plaintiff's right arm out from underneath his body but were unable to do so because of the resistive tension. (**Reginato Aff., Ex. 3, P's Depo., p. 95:12-21.**)

64. After the empty-hand strikes, Plaintiff did not place his right arm behind his back but continued to keep his arm tense and underneath his body. (**Reginato Aff., Ex. 6, Wicketts Depo., p. 18:6-10); (Reginato Aff., Ex. 3, P's Depo. pp. 92:24-25; 93:1.**)

65. Officer Wicketts then delivered a second knee-strike to Plaintiff's upper-thigh area in an attempt to gain compliance while continuing to order Plaintiff to place his arms behind his back. (**Reginato Aff., Ex. 6, Wicketts Depo., p. 18:9-11**); (**Reginato Aff., Ex. 3, P's Depo. pp. 92:12-25; 94:3-10.**)

66. At this time, the officers were still attempting to physically pry Plaintiff's right arm out from underneath his body but were unable to do so because of the resistive tension. (**Reginato Aff., Ex. 3, P's Depo., p. 95:12-21.**)

67. After the second knee-strike, Plaintiff did not place his right arm behind his back but continued to keep it tense and underneath his body. (**Reginato Aff., Ex. 3, P's Depo., p. 93:13-25.**)

---

[8] Plaintiff testified that he has no recollection (either way) regarding where the strikes landed and therefore cannot dispute this fact. (**Reginato Aff., Ex. 3, P's Depo. p. 91:22-24.**)

68. Officer Wicketts therefore delivered a third knee-strike to Plaintiff's upper-thigh area in an attempt to gain compliance while continuing to order Plaintiff to place his arms behind his back. (**Reginato Aff., Ex. 3, P's Depo., pp. 93:13-25, 94:1-10.**)

69. At this time, the officers were still attempting to physically pry Plaintiff's right arm out from underneath his body but were unable to do so because of the resistive tension. (**Reginato Aff., Ex. 3, P's Depo., p. 95:12-21.**)

70. After the third knee-strike, Plaintiff did not place his right arm behind his back but continued to keep it tense and underneath his body. (**Reginato Aff., Ex. 3, P's Depo., p. 95:2-11.**)

71. Officer Wicketts therefore delivered a fourth knee-strike to Plaintiff's upper-thigh area in an attempt to gain compliance while continuing to order Plaintiff to place his arms behind his back. (**Reginato Aff., Ex. 3, P's Depo., pp. 93:13-25, 94:1-10.**)

72. At this time, Sergeant Cooper applied a mandibular hold to Plaintiff's ear for a few seconds in an attempt to gain compliance. (**Reginato Aff., Ex. 3, P's Depo. pp. 96:1-10**); (**Reginato Aff., Ex. 2, Cooper Depo., p. 21:9-22.**)

73. Immediately thereafter, the officers felt "the resistance form [Plaintiff] release" and were able to place Plaintiff's arm behind his back and handcuff him. (**Reginato Aff., Ex. 6, Wicketts Depo., p. 20:4-15.**)

74. KPD had in effect written policies on August 24, 2015 that were consistent with Wisconsin law and designed "to preserve peace, order and safety; enforce[] laws and ordinances; and safeguard constitutional rights." (**Hamm Aff., Ex. 1, KPD Policies**.)

75. The following KPD written policies were in effect on August 24, 2015:

- **STOP AND FRISK (Policy 1.5)**: Governed stop and frisk.
- **QUESTIONING (Policy 1.7)**: Governed investigation/questioning.

- **ARREST (Policy 1.8)**: Governed detentions, arrests, probable cause and reasonable suspicion.
- **USE OF FORCE (Policy 1.3)**: Governed use of force, use of force continuum and prohibition against excessive force.
- **CITIZEN COMPLAINTS (Policy 52.2)**: Governed procedures for filing, investigating and resolving citizen complaints.
- **INTERNAL AFFAIRS (Policy 11.4)**: Governed internal investigation and review of police officer conduct.
- **TRAINING & EVALUATION (Policy 33.1)**: Governed police officer training and performance evaluations.
- **DISCIPLINE (Policy 26.1)**: Governed disciplinary action for violation of policies, rules and regulations.
- **RACIAL PROFILING (Policy 41.3)**: Governed racial profiling and required training on preventing the same.
- **HANDLING JUVENILES (Policy 44.1)**: Governed handling juveniles.

(**Hamm Aff., Ex. 1, KPD Policies.**)

76. Police officers employed at the City of Kenosha Police Department on/prior to August 24, 2015 were required to complete a 540-hour police training course at the police academy where they received training on, among other things: use of force, passive and active resistance, defense and arrest tactics, and stop and frisk. (**Dillhoff Aff., ¶ 4**); (**Reginato Aff., Ex. 8, 9/29/16 Transcript of Aaron Dillhoff Deposition (Dillhoff Depo.), p. 39:1-10; 41:4-9**); (**Reginato Aff., Ex. 1, Valeri Depo., p. 72:22-25**); (**Reginato Aff., Ex. 2, Cooper Depo., pp. 36:14-25; 37:1-4**); (**Reginato Aff., Ex. 7, Stich Depo., pp. 34-35**); (**Reginato Aff, Ex. 6, Wicketts Depo., pp 36-37, 67.**)

77. After starting employment with KPD, new recruits were required to complete a four/five-week classroom Pre-Field Training Program where they received training on, among other things: all policies and procedures; use of force, passive and active resistance, defense and arrest tactics, and stops and frisks. (**Dillhoff Aff., ¶ 5**); (**Reginato Aff., Ex. 8, Dillhoff Depo.,**

pp. 39:21-25; 40:1-13; 41:4-9); (**Reginato Aff., Ex. 1, Valeri Depo., pp. 38:11-21; 73:14-25; 74:1-2**); (**Reginato Aff., Ex. 2, Cooper Depo., pp. 39:3-19; 47:5-9.**)

78. After successfully completing the Pre-Field Training Program, KPD officers were required to participate in a comprehensive Field Training Program for several months where they were paired with multiple training officers and received training on, among other things: use of force, passive and active resistance, defense and arrest tactics, and stop and frisk. (**Dillhoff Aff., ¶ 6**); (**Reginato Aff., Ex. 6, Wicketts Depo., pp. 47-49; 52:5-25; 67-68, 72-74**) (**Reginato Aff., Ex. 1, Valeri Depo., pp. 38:11-21**); (**Reginato Aff., Ex. 2, Cooper Depo., p. 39:6-12, 20-24.**)

79. During the Field Training Program, all trainee officers were required to meet with KPD supervisors weekly to discuss their training, monitor their progression, and ensure all standards set by KPD were being met. (**Dillhoff Aff., ¶ 7**); (**Reginato Aff., Ex. 1, Valeri Depo., p. 39:1-8**); (**Reginato Aff., Ex. 8, Dillhoff Depo., pp. 34:11-18.**)

80. KPD officers were also required to complete a minimum of 32 hours of ongoing formal yearly training (which is above the 24-hour yearly training required by Wisconsin law) where they received training and legal updates relating to, among other things: use of force, passive and active resistance, defense and arrest tactics, and stop and frisk. (**Dillhoff Aff., ¶ 8, Ex. 1, Training Records**); (**Reginato Aff., Ex. 6, Wicketts Depo., pp. 36-39; 73-74**); (**Reginato Aff., Ex. 8, Dillhoff Depo., pp. 39:9-16; 43:19-25**); (**Reginato Aff., Ex. 1, Valeri Depo., pp. 40:13-22; 73:21-25; 74:1-2**); (**Reginato Aff., Ex. 2, Cooper Depo., pp. 39-41, 47.**)

81. KPD officers also received on-the-job training through roll-calls, debriefing sessions and refresher courses where scenarios-based circumstances and appropriate responses regarding the above-referenced topics were discussed. KPD also provided officers with legal updates relating to those topics from the district attorney/city attorney's office. (**Dillhoff Aff., ¶**

**9**); (**Reginato Aff., Ex. 7, Stich Depo., p. 35:4-14**); (**Reginato Aff., Ex. 8, Dillhoff Depo., p. 44:1-7**); (**Reginato Aff., Ex. 6, Wicketts Depo., pp. 52-53, 69:12-25.**)

82. Daniel Tate pled guilty to a disorderly conduct charge stemming from the August 24, 2015 incident at issue in this lawsuit. (**Reginato Aff., Ex. 3, P's Depo. p. 59:9-13**); (**Reginato Aff., Ex. 5, Tate Depo., p. 53:16-18.**)

Dated this 31st Day of January, 2017.

**ARENZ, MOLTER, MACY, RIFFLE & LARSON, S.C.**
Attorneys for City of Kenosha, Daniel Cooper, Aaron Dillhoff, Andrew Valeri, Alex Wicketts and Aaron Stich.

BY: /s/ Matteo Reginato
REMZY D. BITAR
State Bar No: 1038340
MATTEO REGINATO
State Bar No.: 1089724

720 N. East Avenue
Waukesha, WI 53186
Telephone: (262) 548-1340
Fax: (262) 548-9211
Email: rbitar@ammr.net
mreginato@ammr.net